CENTRAL COAL & COKE COMPANY *v.* BURNS, ADMINISTRATOR.

Opinion delivered October 13, 1919.

1. MASTER AND SERVANT—DEATH OF SERVANT COAL MINER—UNINSULATED LIVE WIRE.—The operator of a coal mine permitted uninsulated and exposed electric wires, one dead but the other carrying 225 to 250 volts of electricity, to be strung along a pas-

sageway used by the miners in their work. Deceased, a miner, came in contact with the live wire, and was killed. *Held*, the jury was warranted in finding that the defendant was guilty of negligence in the construction and maintenance of the wire.

2. SAME — SAME — SAME — CONTRIBUTORY NEGLIGENCE.—Under the facts detailed in the above syllabus, *held*, the trial court was correct in refusing to declare deceased guilty of contributory negligence as a matter of law.

3. SAME — SAME — SAME — INSTRUCTION.—When the court had already instructed the jury that there was no negligence in the maintenance of the dead wire, and that the same carried no current, another instruction is not prejudicial which uses the term *wires* in the plural, and charges negligence in not insulating and protecting the *wires*.

4. ASSUMED RISK—BURDEN OF PROOF.—Assumption of risk is an affirmative defense, and the burden is upon the defendant to establish it unless it is shown by the plaintiff's own testimony.

5. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—TWO INSTRUCTIONS.— Defendant, in a personal injury suit, is not entitled to two instructions upon the issue of contributory negligence, and when one correct instruction has been given, defendant will not be heard to complain that a second and similar instruction was refused.

6. MASTER AND SERVANT—DEATH OF SERVANT—AMOUNT OF DAMAGES —Deceased, a coal miner, was electrocuted by coming in contact with a live wire in the mine. He lived fifteen minutes and suffered great pain. *Held*, the verdict for $5,000 was not excessive.

7. PERSONAL INJURY ACTIONS—DEATH—UNEXPLAINED INJURY—PRESUMPTION.—In personal injury actions when the manner in which deceased sustained the fatal injury is unknown, there is always a presumption against the deceased having intentionally inflicted injury upon himself.

Appeal from Sebastian Circuit Court, Greenwood District; *Paul Little,* Judge; affirmed.

*James B. McDonough,* for appellant.

1. The court erred in not directing a verdict for defendants. The proof wholly fails to sustain the allegations of plaintiff as to negligence. Plaintiff was not in the ordinary discharge of his duties nor in the place where his duties were, but was where he ought not to have been, and the injury was the result of his own

contributory negligence. The obligations of a master do not follow a servant into a place of danger where he is not expected to go. 3 Labatt on M. & S., § 1253; 4 *Id.*, § 1558 B; 65 Ark. 126. There is no presumption of negligence in a case of this kind. 115 Ark. 351.

The burden is on the servant to show liability. 112 Ark. 446; 115 *Id.* 529; 192 S. W. 190.

In cases where the act of the servant himself is the cause of his injury, the master's negligence is immaterial. 130 Ark. 583. Under the proof there could be no recovery. 86 Ark. 289; 91 *Id.* 260.

There is no fact in the record to apprise the master of the servant's danger. 101 Ark. 117; 35 *Id.* 602; 108 *Id.* 183; 113 *Id.* 60; 206 S. W. 634.

2. The court erred in giving instruction No. 6 for plaintiff. 135 Ark. 330.

It is harmful error to give conflicting instructions as here. 134 Ark. 575; 128 *Id.* 336; 83 *Id.* 202.

3. It was error to give Nos. 7 and 8.

4. It was error to give No. 13 on the burden of proof on the assumption of risk. 4 Labatt on Master & Servant, § 1608.

5. The court erred in refusing requests by defendant. 44 Ark. 258; 100 *Id.* 1; 90 *Id.* 135; 103 *Id.* 361; 79 *Id.* 179.

*Ira D. Oglesby,* for appellee.

1. The peremptory instruction for defendant was properly refused. The wires were negligently installed and maintained and plaintiff was guilty of no contributory negligence.

The evidence made a case to go to the jury, and it was properly submitted to one. 152 C. C. A. 244; 245 Fed. 935; 253 *Id.* 362; 199 *Id.* 712-719; 118 C. C. A. 150; 17 Wall. 657. See also 112 Ark. 307; 130 *Id.* 583.

2. There is no error in the instructions. 31 Ark. 103; 68 *Id.* 284; 35 *Id.* 100; 24 *Id.* 124; 80 *Id.* 86; 48 *Id.* 460; 126 *Id.* 563.

The verdict is not excessive. 103 Ark. 361; *Ry. Co.* v. *Craft,* 115 Ark. 483.

HART, J. This is an appeal by a coal company from a judgment against it for damages for the negligent killing of a coal miner while at work in its mines.

The principal issue raised by the appeal is that the court erred in not directing a verdict in favor of the defendant coal company.

Key Burns was employed as a coal digger in mine No. 4 of the Central Coal & Coke Company of Hartford, Sebastian County, Arkansas, and was engaged in digging coal in room 46 on the morning he received the injuries which resulted in his death. The mine was the usual kind of a mine operated upon the room and pillar plan. A curtain was stretched across the entry for the purpose of ventilation. There was a track which led from the main track into the room where Key Burns worked. On the morning of the accident, Key Burns had filled a car with coal. In accordance with the custom he had called on the driver to take out the loaded car and place him an empty car in his room. The usual custom was that before the driver would go into the room to haul out the loaded car he would push the empty car away from the room entry a sufficient distance so that it would not interfere with the moving of the loaded car. It was the custom of the miner to assist the driver. They would push the loaded car out and the empty car in afterwards, when they could do so. If they could not do this, the driver would hitch the mule to the cars and pull them out and in with it.

Hugh Waters was the driver, and on the morning in question hitched his mule to the loaded car and pulled it out of the room. Waters and Burns had pushed the empty car beyond the curtain and beyond the switch point, leaving the empty car on the main line. This was done so that the loaded car could be pulled out without striking or interfering with the empty car. Waters then hitched the mule to the loaded car and pulled it through the curtain, stopping out on the main line after it had been placed out a sufficient distance beyond the curtain.

After stopping the loaded car east of the curtain, Waters unhitched the mule from the loaded car and drove it along in front of the empty car. At that time the west end of the empty car was at the curtain. Waters then hitched the mule to the empty car at the switch and started to pull the empty car into the room where Key Burns worked. At the time that Hugh Waters was unhitching the mule from the loaded car and driving the mule through the curtain, Key Burns was standing at the corner by the side of the car at the switch. Immediately after starting to pull the empty car into the room and about the time the empty car had gone through the curtain, Waters heard Burns halloo or cry out. Waters turned the mule loose and immediately went back to where Key Burns was. He found Key Burns with his back and body pushed back on two electric wires which were strung along there. The feet and head of Burns pointed south and both wires touched his body. Waters first grabbed the leg of Burns to pull him off. He was shocked by electricity and turned Burns loose. He then grabbed Burns by the pant leg and pulled him off of the wires. Burns moved on his all-fours and tried to talk and vomit but could not do so. Burns was white as a sheet and could not say a word. Waters kept talking to him, trying to get him to speak, for about ten or fifteen minutes. Waters then placed Burns on a car and had taken him down the distance of about twenty-eight rooms when he died. The rooms were about thirty feet apart. Burns was groaning all the time. Burns was standing right at the corner of the switch the last time that Waters saw him before the injury. In a few seconds thereafter Waters heard Burns halloo and jumped off the front end of the car and ran around to where Burns was lying. There was both a dead wire and a live wire strung along there. The dead wire was next to the track and was about ten or twelve inches from it. It was just nailed up to the props.

The props are posts set in the ground and extending up to the roof of the mine for the purpose of

supporting it. The live wire was back of the dead wire and was about seven or eight inches from the dead wire. The two wires were parallel with each other and were about the same height from the ground. They were both nailed to the props and had no insulation. There was no plank or boxing to keep any one from coming into contact with the wire.

Another witness stated that the dead wire was about fifteen inches from the track, and that it was about three and a half feet from the ground; that the live wire was about ten inches further away from the track than the dead wire and that the wires were not insulated. The wires were strung along for the purpose of furnishing current to run the machines in the rooms. The dead and the live wires are really the positive and negative wires. The positive wires are the live wires and carry the current to the motor. The negative wire carries the current back to the ground or to the generator. The dead wire is the ground wire. It is connected permanently with the ground and is the same as the ground. If one with his body touches the live wire and the dead wire at the same time he will get a shock by electricity. Connecting the two wires makes the circuit. One will not receive any shock if he only touches the dead wire. The live wire in question carried from 225 to 250 volts of electricity.

(1) In testing the sufficiency of the evidence to support the verdict, the testimony must be considered in the light most favorable to the plaintiff. Therefore it is unnecessary to abstract the evidence adduced by the defendant. It is sufficient to say that the evidence of the defendant tended to show that there was no negligence on its part and that Key Burns was guilty of contributory negligence. While it was necessary for the electric wires to be strung along there for the purpose of furnishing electricity to run the machines in the various rooms where they were placed, the testimony for the plaintiff tends to show that they might have been insulated or that a plank might have been nailed in front of them so

that the servants having occasion to work near them would not come in contact with the live wire. Hence the jury was warranted in finding that the defendant was guilty of negligence in the construction and maintenance of the wires.

(2) It is earnestly insisted, however, that Key Burns was guilty of contributory negligence as a matter of law and that the court erred in refusing so to instruct the jury. This we consider the most serious question in the case, but under all the circumstances adduced in evidence we believe that the court was right in submitting that question to the jury.

According to the evidence adduced by the plaintiff, it was the duty of Key Burns to assist the driver in getting the loaded car out of his work room and in placing the empty one in it. The dead wire was only ten or twelve inches from the track and the wires were eight or ten inches apart. This places the live wire from eighteen to twenty-two inches from the track. The post to which the wires were attached was in a narrow space between the gob and the track, the live wire being next to the gob.

The jury might have inferred that Key Burns stepped back next to the dead wire for the purpose of getting out of the way of the moving car and that he stumbled or his foot slipped in some way so that he fell back against the live wire and in this way received the injuries which resulted in his death. There is nothing in the record tending to indicate that he intended to commit suicide or that he purposely placed himself in contact with the live wire. It is fairly inferable that he stumbled or slipped and fell against it and in this way was injured. This view is strengthened when we consider the state of the record. The witnesses had a map of the scene of the accident before them when they testified and evidently pointed to positions on the map in describing the position of the actors at the time of the accident. This testimony was plain to the jury and showed exactly the proximity of Burns to the wires. These positions

were not marked on the map so that we can follow the testimony as plainly as the jury. *San Jacinto Rice Co. v. Ulrick* (Tex. Civ. App.), 214 S. W. 777.

The next assignment of error is that plaintiff's instruction No. 6 submitted issues of negligence upon which there was no proof. This contention is without merit. The complaint charged as negligence: (1) Failure to insulate the wire; (2) not protecting the wire with a plank or in some other suitable manner; (3) placing them uninsulated and unprotected too close to where the employees worked; (4) permitting the dead wire to become charged with electricity. There was testimony to sustain all these allegations except that defendant permitted the dead wire to become charged. The court by a specific instruction told the jury that there was no evidence upon which to submit this issue and that it should not consider it. The instruction complained of was in general terms, and, this issue having been withdrawn from the jury by a specific instruction, such an instruction would be considered as explaining the general instruction, and not as being contradictory to it. We do not deem it necessary to set out the instruction, and are of the opinion that the jury could not have in any wise been misled by it when read in the light of the other instruction given by the court.

(3) It is next insisted that the court erred in giving instruction No. 8, which is as follows: "If you believe from the evidence that the defendant, Central Coal & Coke Company, negligently constructed and maintained electric wires in its mine and negligently failed to safeguard said wires, and that said wires carried a dangerous current of electricity and that deceased in the performance of his duty was likely to come in contact with said wires, and you further believe from the evidence that said defendant, by the exercise of ordinary care and caution, could have rendered said wires reasonably safe by insulation or by protecting said wires, if they could not be insulated, so that its employees would not, in the discharge of their duty come in contact with same, and that

it in the manner alleged in the complaint failed to do so, then such failure was negligence.''

It is claimed that the instruction is erroneous because the court submitted to the jury the negligent construction and maintenance of both the live and the dead wires. We do not think that this constitutes reversible error. As we have already seen, the court specifically told the jury there was no issue of negligence on the construction and maintenance of the dead wire for it to determine. When that is considered in connection with instruction No. 8 complained of, we do not think that the jury were confused or misled by the court giving instruction No. 8. The instruction refers only to wires that carried a dangerous current of electricity, and the jury bearing in mind that the court had withdrawn from its consideration the allegation of the complaint with regard to the negligent construction of the dead wire, and had specifically stated to it that there was not sufficient evidence to sustain that allegation of negligence, could not have been misled by the court giving the instruction.

(4) It is also alleged that the court erred in instructing the jury that the burden of proof was upon the defendant to establish its defense of assumption of risk. Assumption of risk was an affirmative defense, and the burden of proof was upon the defendant to establish it unless it was shown by the plaintiff's own testimony. Such has been the uniform holding of this court with respect to the defense of contributory negligence, which is also an affirmative defense. *Little Rock & Fort Smith Ry.* v. *Atkins,* 46 Ark. 423; *L. R. M. R. T. Ry. Co.* v. *Leverett, Admr.,* 48 Ark. 333; *St. L., I. M. & S. R. Co.* v. *Sparks,* 81 Ark. 187; *St. L., I. M. & S. R. Co.* v. *Gilbreath,* 87 Ark. 572; *St. L., I. M. & S. R. Co.* v. *Hutchinson,* 101 Ark. 424, and *St. L., I. M. & S. R. Co.* v. *Rodgers,* 118 Ark. 263.

(5) The next assignment of error is the court erred in refusing to give defendant's instruction No. 8 on the contributory negligence of the deceased. We do not deem it necessary to set out the instruction. The court did give at the request of the defendant instruction No. 6,

which is as follows: "The court instructs the jury that the master is not an insurer of the safety of the employee. The master has the right to install electric wires for use in the mines, and he has a right to install them along entry ways. If the deceased, Key Burns, failed to use due care, while passing through the mine, and if his death is due solely and alone to his negligence in touching a live wire, and if it was not due to any negligence of the defendant, then the plaintiff can not recover."

The defendant was not entitled to two instructions on the question of contributory negligence. The one given by the court plainly submitted that question to the jury.

(6) Finally it is insisted that the verdict is excessive. We can not agree with counsel for the defendant in his contention. It is fairly inferable from the testimony that Key Burns lived fifteen minutes after he was injured and that he endured conscious pain and suffering during that time. One of the witnesses stated that after he pulled Burns away from the wires he moved along on his all-fours and tried to talk and vomit, but could not do either; that he attempted to give Burns water and Burns would spit it back; that this continued for ten or fifteen minutes and that they then started out of the mine with Burns; that he lived until they had traversed a distance of about 800 feet. From this testimony the jury might have inferred that he was conscious and suffered great pain.

The court upheld a verdict for $5,000 in a case where the decedent lived for fifteen minutes and suffered great pain. *St. L., I. M. & S. R. Co.* v. *Craft,* 115 Ark. 483.

We find no reversible errors in the record, and the judgment will be affirmed.

HART, J., (on rehearing). Counsel for appellant has filed a voluminous brief entirely devoted to the argument that there is no proof of a substantial character which would warrant the submission of the case to the

jury. He claims that the verdict of the jury under the facts as disclosed by the record must have resulted from conjecture merely. We do not agree with the contention of counsel for appellant. The witnesses were examined and cross-examined at great length and it is impractical to set out their testimony in full. Within the proper limits of an opinion we can only undertake to set out the substance of the testimony.

As we pointed out in our original opinion, the witnesses testified that the live and the dead wires were strung along on posts without insulation and that they were parallel to each other and about ten inches apart. They were about three and a half feet above the floor of the mine and the gob or earth wall was right behind them. The impression of the clothes of Burns was left upon the earth of the gob. His body showed a burn on his neck and also one about ten inches below on his back. No one saw him hurt and he was found under the wires almost immediately after he cried out.

Counsel for appellant claim that the position in which he was found shows conclusively that he did not fall or stumble. He contends that the physical facts show that if he had done so, he would not have been under the wires. As we have just seen, there was the print of his clothes on the gob behind the live wire indicating that he might have fallen over the wires and his body at first rested on the gob, then by a violent struggle to escape from the wire he might have fallen from the gob down under the wires and have attempted to crawl out from under them . This is indicated by the fact that when he was rescued from the wires he commenced to crawl off on his all-fours. At least the jury might have legitimately inferred a state of facts such as we have just described.

(7) As we pointed out in our original opinion, there is always a presumption against suicide. There was nothing in the record whatever tending to show that the injury to the deceased was otherwise than accidental. An affirmative circumstance tending to show that his death was not the result of design was the fact that he

commenced crawling off on his all-fours as soon as he was pulled from under the wires.

It follows that the motion for rehearing will be denied.